UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ANNETTE SOTO-RAMIREZ,

                    Plaintiff,

v.                                                          Case No.  5:08-cv-112-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying her application for disability insurance benefits.

(Doc. 1.)  The Commissioner has answered (Doc. 10) and both parties have filed briefs

outlining their respective positions.  (Docs. 17 & 24.)  For the reasons discussed below,

the Court finds that the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On May 24, 2005, Plaintiff filed an application for a period of disability and

disability insurance benefits, claiming a disability onset date of December 16, 2003. (R.

17, 87.)  Plaintiff's applications were denied initially and upon reconsideration. (R. 51-

52, 54-55.)  Thereafter, Plaintiff timely pursued her administrative remedies available

before the Commissioner, and requested a hearing before an Administrative Law Judge

("ALJ").  (R. 50.)  The ALJ conducted Plaintiff's administrative hearing on June 14,

2007. (R. 431-81.)   The ALJ issued a decision unfavorable to Plaintiff on August 23,

2007. (R. 14-28.)  The Appeals Council denied Plaintiff's request for review. (R. 6-9.)

Plaintiff then appealed to this Court.   (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] <u>See</u> 42 U.S.C. § 405(g).

[2] <u>See</u> <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>See</u> <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>See</u> <u>Foote</u>, 67 F.3d at 1560; *accord,* <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] See Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] See 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] See 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] See 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] See 20 C.F.R. § 404.1520(b).

[10] See 20 C.F.R. § 404.1520(c).

[11] See 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] See 20 C.F.R. § 404.1520(e).

[13] See 20 C.F.R. § 404.1520(f).

[14] See Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] See Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] See Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] See Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was born on September 30, 1964 and was forty-two (42) years old when the ALJ issued his decision.  (R. 195.)  Plaintiff graduated high school, completed one year of college and worked as a secretary in the public school system for 13 years. (R. 143, 146.)  Plaintiff contends that she has been unable to work since December 16, 2003 because of pain, an anxiety disorder, depression and agoraphobia. (R. 119, 372-73.)

In 2001, Plaintiff was diagnosed with breast cancer and underwent a partial mastectomy, chemotherapy and radiation.  (R. 291-93.)  On January 26, 2006, Howard Hochster, M.D.  found no detectable recurrence of the cancer, but noted that Plaintiff

---

[18] <u>See Walker</u> at 1003.

[19] <u>See Wolfe</u> at 1077-78.

[20] <u>See id</u>.

[21] <u>See Doughty</u> at 1278 n.2.

had fat necrosis. (R.344-45.)  In a letter dated November 6, 2007, Bernard Chang, M.D. wrote that due to Plaintiff's scarring and fat necrosis she "may have difficulty with muscle activity or lifting." (R. 408.)

As early as 2001, Plaintiff suffered from anxiety and was taking Paxil.  (R. 291.) In early 2002, Plaintiff was seen by Joseph De Meyer, Ph.D. and reported a history of abuse by her husband for more than seven years, losing a child, injuring her leg and ankle, a terminally ill sister, and surviving breast cancer. (R. 353-54.) Dr. De Meyer diagnosed Plaintiff with Manic Depression and Severe Panic Disorder with Agoraphobia and noted that she had characteristics of Post Traumatic Stress Disorder.

From February 21, 2003 through June 18, 2005, Plaintiff was treated by Wali Mohammad, M.D., a psychiatrist, in New York.  (R. 213-230.)  Over that two-year period, Dr. Mohammad prescribed Buspar, Paxil, Lexapro, and Lorazepam.  (R. 230.) On February 26, 2003, Dr. Mohammad diagnosed Plaintiff with panic disorder with agoraphobia and generalized anxiety disorder. (R. 226.)  Dr. Mohammad noted that Plaintiff had a history of anxiety for the past thirteen years but that it had worsened in the past two weeks.  Plaintiff reported a number of stressors including breast cancer, loss of full-term baby four years ago, and fibromyalgia.  On February 2, 2004, Plaintiff reported that her condition had worsened and that she was not leaving the house.  (R. 222.)  On March 30, 2005, Plaintiff reported being "much better." (R. 214.)

Plaintiff then moved to Florida and began treatment at Lifestream Behavioral Center with various doctors and nurse practitioners. (R. 264-67.)[22]  On June 24, 2005, Eduardo A. Herrera, M.D. performed a psychiatric evaluation. (R. 264-67.)  Dr. Herrera diagnosed Plaintiff with panic attacks with agoraphobia and history of depressive disorder and noted her GAF score was 65.  Dr. Herrera noted that Plaintiff was well-groomed, with logical speech and appropriate judgment.  He found that Plaintiff did not suffer from any intellectual impairment, memory impairment, or thought disorder.  He noted that Plaintiff was "histrionic" in the presentation of her complaints.   On July 22, 2005, Dr. Herrera stated that Plaintiff was "extremely histrionic", and noted that her appearance was appropriate, her behavior was cooperative, she was reality-based, her judgment was normal and she was not having hallucinations. (R. 258.)  Dr. Herrera lowered Plaintiff's GAF score to 50. (R. 259.)

Plaintiff was seen by Mary Johnson, a nurse practitioner on August 5, 2005, September 9, 2005 and October 13, 2005.(R. 255-57.)  Nurse Johnson tried Plaintiff on a few different anti-psychotic medications and noted that Plaintiff was suffering from Post Traumatic Stress Disorder and that a diagnosis of bi-polar disorder should be ruled out.   Although Plaintiff reported frequent panic attacks and anxiety, Nurse Johnson noted that Plaintiff was well-dressed, with perfect make-up, hair, expensive clothing and handbag. (R. 255.)   On September 9, 2005, Nurse Johnson completed a Mental RFC Assessment finding that Plaintiff had some marked limitations in understanding and

_____

[22] It is unclear whether all of the records from Lifestream were before the ALJ or whether they were submitted to the Appeals Council.  However, the Court need not resolve this dispute.  As discussed below, Plaintiff has appealed the decision of the Appeals Council, and thus, it is appropriate for the Court to consider all of the record evidence, including any evidence submitted to the Appeals Council.

memory, sustained concentration and persistence, social interaction, and adaptation. (R. 252-54.)   On December 1, 2005, Plaintiff was seen by Nurse Johnson and reported that she had been to the emergency room due to panic and stress over the past two weeks related to her recent move.  (R. 415.)

On May 19, 2006, Plaintiff began treatment with Brad Broyles, M.D. another doctor at Lifestream Behavioral Center. (R. 419.)  Plaintiff reported that her anxiety was still a problem and that she had missed a few doses of medicine.  Plaintiff's mental status was largely normal.  On June 23, 2006, Plaintiff reported that her father was very ill and that her anxiety was worse, although her mental status remained mostly unchanged. (R. 420.)   On August 18, 2006, Plaintiff reported severe depression and mood imbalance but it was also noted that she was "drinking 2 bottles of wine." (R. 421.)  On December 22, 2006, Plaintiff reported severe anxiety and depression but her mental status remained largely unchanged other than reporting some past vague/fleeting suicidal ideation. (R. 424.)  The records show that Plaintiff missed numerous appointments.  (R. 410-12.)

On April 27, 2007, Dr. Broyles noted that despite complaints of anxiety and depression, Plainitff's appearance was appropriate, her behavior was cooperative, and her judgment was normal. (R. 396.)  That same day, Dr. Broyles completed a RFC assessment in which he checked boxes finding that Plaintiff had marked limitations in almost every category of understanding and memory, sustained concentration and persistence, social interaction and adaptation. (R. 393-95.)  In support of his assessment, Dr. Broyles explained that Plaintiff "is extremely limited in terms of detailed

attention concentration ability to attend to tasks" and that she "suffers mood swings" and "marked anxiety."

In a letter dated November 9, 2007, Dr. Broyles noted that Plaintiff had been a patient at Lifestream since June 24, 2005. (R. 407.) He noted that she was initially diagnosed with anxiety disorder, then post traumatic stress disorder and then bi-polar disorder in April 2007. He also noted that while Plaintiff was initially assessed with a GAF of 65 her functioning was found to be in the range of 45-50.

On August 3, 2005, Plaintiff was seen by William Austin, Psy.D. for a consultative evaluation. (R. 231-33.) Dr. Austin's diagnosis was panic disorder with agoraphobia; major depressive disorder, single episode; generalized anxiety disorder, by history; and status-post breast cancer, by history. On examination, Plaintiff did not demonstrate any symptoms of psychosis; her thought processes were linear; her attention and concentration were sustained; her recall for recent and remote events suggested no severe short term or long term memory impairment; her mood appeared depressed with significant anxiety; and her judgment, impulse control and insight were marginal. Dr. Austin concluded that Plaintiff was not capable of managing her own funds based on agoraphobia, that her social functioning was poor based on social isolation and that her functional ability appeared poor based on significant mental illness.

Two non-examining state agency physicians reviewed the records and completed a Psychiatric Review Technique form and a Mental RFC Assessment. Eric Wiener, Ph.D performed his review on August 22, 2005. (R. 234-51) Wiener concluded that Plaintiff's affective disorders and anxiety disorders did not meet the listings and resulted in only mild to moderate limitations. He further found that Plaintiff's emotional issues

might limit her to more routine tasks in a less demanding environment, and she might be limited to a work environment with only brief interactions with others. He also noted that Plaintiff seemed capable of negotiating usual work hazards and changes.

On November 7, 2005, James Mendelson, Ph.D. performed his review.(R. 268-75.) Mendelson found that Plaintiff's affective disorders and anxiety disorders did not meet the listings and that they only resulted in mild to moderate limitations. Mendelson noted that Plaintiff has a history of histrionic and very manipulative behaviors and the credibility of her ADL restrictions is limited; that she has shown little interest in obtaining and maintaining a residence or job, and yet she spends a great deal of time on her appearance; she has abrogated most responsibilities for performing routine household chores but that she is capable of performing such activities.

At the hearing, Plaintiff testified that she has trouble concentrating and that if she reads anything traumatic it makes her mind race for days. (R. 438.) Plaintiff testified that she has not been shopping in several years because she has panic attacks and on at least one occasion passed out in the store. (R. 438-40.) Plaintiff testified that the medication makes her very sleepy. (R. 449.) Plaintiff does not help with the cooking but she loads the dishwasher, and she generally dresses and bathes herself. (R. 451.) Plaintiff testified that on a typical day she wakes up around 7:30 and says goodbye to her daughter, eats breakfast, takes her medication and then goes back to sleep until 3:00 or 4:00 in the afternoon and then goes to sleep at 8:00 for the night.(R. 451-52.) Plaintiff testified that she does not do any exercise, does not have any hobbies, is not involved in any outside activities and does not go anywhere that there are crowds of people. (R. 454-56.) Plaintiff testified that she sits outside with her mother. (R. 466-67.)

Plaintiff testified that she is seeing Dr. Broyles for depression, agoraphobia, bipolar disorder, panic and anxiety and that he has prescribed Cymbalta, Celexa, Klonopin, Seroquel and Lamictal (R. 458-59.)   Plaintiff reported that she broke her left ankle in 2003 and she still suffers from swelling and severe pain. (R. 459-60.)  Plaintiff testified that she had muscle removed from her chest and lymph nodes and it is painful, although she can raise both arms over her head.  (R. 460-61.)  Plaintiff testified that she has trouble walking but that she could slowly walk a block. (R. 463.)  She can stand for 15 to 20 minutes.    Plaintiff testified that on a scale of zero to ten, her pain is a nine and sitting makes it worse. (R. 464.)  Plaintiff said that doctors have told her not to run, play sports, strain her chest by moving things or mopping.  Plaintiff reported she suffers from panic when she has to ride in cars. (R. 469.)  Plaintiff testified that she had trouble with co-workers because they were all against her and that she cannot deal with anyone "screaming at me or raising their voice at me or intimidating me or putting me down." (R. 470.)

Based on his review of the record, including Plaintiff's testimony and the medical records from several health care providers, the ALJ determined that Plaintiff had affective mood disorder; anxiety related disorder; panic disorder with agoraphobia; status post right breast cancer; and status post left ankle fracture.  (R. 19.)  However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (R. 20-23.)   The ALJ specifically found that Plaintiff did not meet the requirements of listing 12.04 (Affective Disorders) or listing 12.06 (Anxiety Disorders).

The ALJ then found that Plaintiff retained the RFC to perform low stress (non-production oriented), simple, unskilled, with one, two, or three step instructions. The ALJ found no restrictions on lifting and/or carrying. Plaintiff could stand and/or walk for a total of 2 hours in an 8-hour workday; and sit for a total of 6 hours in an 8-hour workday. The ALJ found that she should avoid frequent ascending and descending stairs and she should avoid pushing and pulling motions with her lower extremities but that she could perform pushing and pulling motions with her upper extremities within the aforementioned weight restrictions. The ALJ found that Plaintiff could perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching. He also found that due to mild to moderate pain and medication side effects, Plaintiff should avoid hazards in the workplace such as unprotected areas of moving machinery; heights; ramps; ladders; scaffolding; and on the ground, unprotected areas of holes and pits. Plaintiff is able to occasionally balance, stoop, crouch, kneel and crawl but she should never climb. Plaintiff has depression, which affects her ability to concentrate upon complex or detailed tasks but would remain incapable of understanding, remembering and carrying out detailed tasks but would remain capable of understanding, remembering and carrying out simple job instructions. The ALJ concluded that Plaintiff has limitations but no substantial loss of ability to perform any of the basic mental work-related activities of unskilled work. The ALJ concluded that Plaintiff could not perform her past relevant work, but that she could perform jobs that exist in significant numbers in the national economy. (R. 27.) In reaching this conclusion, the ALJ relied on the testimony of a vocational expert. Accordingly, the ALJ found that Plaintiff was not disabled.

## IV. DISCUSSION

Plaintiff raises three arguments on appeal – i.e., that the ALJ failed to properly evaluate the opinions of two of Plaintiff's treating physicians; that the ALJ failed to properly evaluate Plaintiff's subjective complaints; and that the ALJ improperly relied on the testimony of the vocational expert. None of these arguments have merit.

### A.     The ALJ properly evaluated opinions of Plaintiff's treating physicians

Plaintiff argues that the ALJ failed to give proper weight to the opinions of two of Plaintiff's treating physicians – Dr. Herrera and Dr. Broyles – both of whom, treated Plaintiff at Lifestream Behavioral Center.

As an initial matter, the government contends that the Court should not consider certain treatment records from Lifestream Behavioral Center because they were submitted to the Appeals Council and not to the ALJ.[23]   The parties dispute when these records were submitted.[24]   However, because Plaintiff has appealed the decision of the Appeals Council upholding the decision of the ALJ, this Court must consider the evidence before the ALJ as well as any evidence submitted to the Appeals Council in determining whether the Commissioner's decision is supported by substantial evidence.[25]

---

[23] These treatment records are found at pages 407-430 of the record.

[24]  Plaintiff contends that although the records are attached as part of the appeal to the Appeals Council, they were filed before the ALJ and were referred to in the Plaintiff's memorandum to the ALJ. See Doc. 17 at page 5, n.4.  However, as the Commissioner correctly points out, in that memorandum Plaintiff only mentioned the April 27, 2007 treatment note (which the ALJ discussed) and a note from October 10, 2005 (that does not appear to be in the record.) See Doc. 24 at 9, n.4.

[25] Ingram v. Commissioner of Social Security, 496 F.3d 1253, 1262 (11th Cir. 2007.)

13

Upon a review of the ALJ's decision, as well as an examination of the medical records at issue (including the records submitted to the Appeals Council), the Court finds that the ALJ  properly considered the opinions of Dr. Herrera and Dr. Broyles as treating physicians.  Moreover, the ALJ articulated good cause for discounting Dr. Broyles' opinions regarding Plaintiff's functional limitations.

Dr. Herrera diagnosed Plaintiff with panic attacks with agoraphobia and a history of depressive disorder.  Despite these diagnoses, Dr. Herrera did not identify any functional limitations resulting from these mental impairments.  Indeed, during the June 24, 2005 psychiatric evaluation, Dr. Herrera noted that Plaintiff was oriented in all 3 spheres, her speech was logical and goal directed, she did not have any intellectual or memory impairment, her judgment was appropriate and there was no evidence of a thought disorder, delusions or hallucinations.  Dr. Herrara also noted that Plaintiff was "histrionic" in the presentation of her symptoms.   Although Dr. Broyles made very similar findings on examination, he opined that Plaintiff had marked limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. 393-97, 419-30.)

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[26]  If a treating physician's opinion on the nature and severity of a

---

[26] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

(continued...)

claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[27]

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[28]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[29]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[30]  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[31]

_____

(...continued)

[27] 20 C.F.R. § 404.1527(d)(2).

[28] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[29] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

[30] 20 C.F.R. § 404.1527(d).

[31] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

Plaintiff takes issue with the fact that while the ALJ accorded great weight to the opinion of Dr. Herrera, the ALJ only mentioned that Dr. Herrera had initially assigned a GAF score of 65 on July 8, 2005 and did not mention that Dr. Herrera had assigned a GAF score of 50 a few weeks later. Plaintiff contends that this lower score was more consistent with Broyles' later GAF and supports a lower level of functioning. While Plaintiff is correct that Dr. Herrera lowered the GAF score, Plaintiff has failed to show how a GAF score of 50 translates into more restrictive mental limitations than those determined by the ALJ. Indeed, the Commissioner has specifically declined to endorse the GAF scale for use in the disability programs and has stated that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders."

Moreover, Dr. Herrera's opinion is consistent with his own treatment records and with the other medical evidence of record. Dr. Herrera's treatment records, as well as those from Dr. Broyles and Nurse Johnson, show that other than feeling depressed and anxious, Plaintiff's mental status was mostly normal – generally finding that Plaintiff's appearance was appropriate, behavior was cooperative, cognition was reality based, judgment was normal, orientation was times 3, and that she was not having hallucinations or suicidal ideation.

Likewise, Dr. Mohammad, who treated Plaintiff for panic disorder with agoraphobia and generalized anxiety disorder, found that while Plaintiff's condition worsened with situational stressors, she reported being much better by March 30, 2005. (R. 226.) The two non-examining state agency physicians found only mild to moderate limitations. (R. 234-51, 268-75.) Consultant Wiener concluded that Plaintiff's emotional issues might limit her to more routine tasks in a less demanding environment, that she

16

might be limited to a work environment with only brief interactions with others, but that she seemed capable of negotiating usual work hazards and changes.   Consultant Mendelson found that Plaintiff remained "reasonably competent to adequately perform most work-like activities." Accordingly, the ALJ's decision to accord great weight to Dr. Herrera's opinion is supported by the other substantial record evidence.

Turning to Plaintiff's argument that the ALJ erred by not according great weight to the opinion of Dr. Broyles, the ALJ articulated two reasons for discounting Dr. Broyles' opinion.  First, the ALJ noted that Dr. Broyles' treatment notes failed to support the assessment in which he found such serious limitations.  (R.22.)  While Plaintiff contends that Dr. Broyles' assessment "is corroborated by the significant weight of the record evidence," the only specific record that Plaintiff even mentions in her memorandum is the consultative report of Dr. Austin.[32]

On the form itself, Dr. Broyles provided no objective medical findings to support the limitations and merely noted that Plaintiff "suffers mood swings" and "marked anxiety."   Moreover, none of Dr. Broyles' treatment notes have any objective medical findings that corroborate the severity of the limitations.   Indeed, the treatment note from April 27, 2007 – the same date that Dr. Broyles completed the assessment reflecting serious functional limitations – reflected that Plaintiff was depressed and anxious, but that she was taking her medication, she was cooperative, her judgment was normal, and her appearance was appropriate.   In fact, all of the treatment records from

---

[32] Plaintiff's characterization of Dr. Broyles' treatment as "two years of consistent treatment" (Doc. 17, page 10) is not accurate.  The record evidence shows that Dr. Broyles saw Plaintiff only on five occasions – i.e.,  May 19, 2006.  (R. 419), June 23, 2006 (R. 426), August 18, 2006 (R. 421), December 22, 2006 (R. 424), and April 27, 2007 (R. 396).

Lifestream demonstrate that while Plaintiff complained of depression and anxiety, her mental status was otherwise normal. And some of the records show that Plaintiff was inconsistent in taking her medications and that she missed appointments. Moreover, as discussed above, the medical records of Dr. Muhammad and the state agency doctors were not consistent with these severe limitations.

Nevertheless, Plaintiff contends that Dr. Broyles' opinion is supported by Dr. Austin's consultative report. Dr. Austin concluded that Plaintiff was not capable of managing her own funds based on agoraphobia, that her social functioning was poor based on social isolation and that her functional ability appeared poor based on significant mental illness. However, on examination, while Plaintiff's mood was depressed with significant anxiety, Dr. Austin found that she did not demonstrate any symptoms of psychosis; her thought processes were linear; her attention and concentration were sustained; her recall for recent and remote events suggested no severe short term or long term memory impairment; and her judgment, impulse control and insight were marginal. Even if Dr. Austin's opinion might offer some support for Dr. Broyles' opinion, the ALJ gave controlling weight to the opinion of Dr. Herrera (and that decision was supported by substantial record evidence), and thus, Dr. Austin's opinion (as a consultative doctor) is not entitled to greater weight than the opinion of Dr. Herrera.[33]

The ALJ went on to explain that Dr. Broyles "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed

---

[33] See 20 C.F.R. §404.1527(d)(2).

to uncritically accept as true most, if not all, of what the claimant reported.  Yet as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints."  Plaintiff argues that this is not a valid basis for rejecting Dr. Broyles' opinion because psychiatrists make diagnosis based on evaluating their patient's subjective reports and that there are no objective tests for depression, agoraphobia or bipolar illness.  Contrary to Plaintiff's argument, there are numerous objective evaluation tools, such as the Minnesota Multiphasic Personality Inventory (MMPI), that are used to assist in identifying psychopathology.   Moreover, as discussed below, the ALJ's decision to discredit Plaintiff's subjective complaints is supported by substantial record evidence.[34]

Accordingly, for these reasons, the Court concludes that the ALJ  properly considered the opinions of Dr. Herrera and Dr. Broyles as treating physicians, and articulated good cause for discounting Dr. Broyles' opinions regarding Plaintiff's functional limitations.[35]

---

[34] Without any explanation as to how it bears on the ALJ's analysis of treating physicians, Plaintiff also argues that "[c]onsideration should . . . be given to the side effects of [Plaintiff's] medication."  Doc. 17 at 11.  However, neither Dr.Herrera nor Dr. Broyles discussed any side effects of Plaintiff's medication or discussed Plaintiff's claims of sleepiness.

[35] Based on the Court's conclusion that the ALJ articulated good cause for discounting Dr. Broyles' opinion, the Court need not address Plaintiff's argument that if the evidence from Dr. Broyles was accepted, Plaintiff's mental condition would meet Listing 12.04.  Moreover, even if Dr. Broyles' opinion was accepted, Plaintiff has failed to explain how the evidence supports a finding that Plaintiff meets Listing 12.04.

**B.      The ALJ's credibility finding is supported by substantial evidence**

Without any specificity, Plaintiff argues that the ALJ improperly rejected Plaintiff's credibility with no evidentiary basis for doing so.  Plaintiff merely contends that the medical evidence "is consistent and supports" Plaintiff's complaints. (Doc. 17, page 12.)

If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[36]  While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[37]  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[38]  However, a lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.[39]  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision,  "the ALJ must either explicitly

---

[36] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[37] Foote at 1562-1563.

[38] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[39] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."[40]

In the instant case, the ALJ concluded that Plaintiff's medical conditions (i.e. affective mood disorder, anxiety related disorder, panic disorder with agoraphobia, status post right breast cancer, and status post left ankle fracture) reasonably could be expected to produce the alleged symptoms, but that the Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 26.) In support of this finding, as discussed above, the ALJ properly accorded great weight to Dr. Herrera's opinion and little weight to Dr. Broyles' opinion regarding Plaintiff's functional limitations. Additionally, the ALJ noted the findings of Dr. Mendelson, the non-examining state agency doctor, who stated that "Plaintiff has a history of histrionic and very manipulative behaviors and the credibility of her activities of daily living restrictions is limited" and noted that Plaintiff has shown little interest in obtaining and maintaining a residence or job; spends a great deal of time on her appearance; and has no responsibilities for household chores even though she is capable of such activities.[41]

The ALJ also correctly noted that (1) Plaintiff's complaints of depression and anxiety can be attributed to situational stressors and vocational disruption; (2) Plaintiff

_____

[40] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

[41] The ALJ also noted that Dr. Herrera gave Plaintiff a GAF of 65. (R. 26.) Even though this was not accurate, because Dr. Herrera subsequently reduced the GAF score to 50, such error was harmless because the ALJ stated numerous other reasons for discrediting Plaintiff's subjective complaints, and those reasons were supported by substantial record evidence.

has not required significant forms of treatment such as multiple psychiatric hospitalizations and emergency room treatment; (3) Plaintiff's treatment was conservative and her mental impairments were well-controlled with medications; (4) there were no psychological studies/testing results or clinical and laboratory findings; and (5) the reported activities of daily living were inconsistent with complaints.

Accordingly, because the ALJ articulated numerous specific reasons for finding Plaintiff's subjective complaints not entirely credible, and those reasons are supported by substantial record evidence, the Court concludes that the ALJ did not err in discrediting Plaintiff's testimony regarding the intensity, persistence and limiting effects of her symptoms.

### C.    The ALJ properly relied on the testimony from the vocational expert

To rely on a VE's testimony, the hypothetical question must reflect Plaintiff's impairments and include those limitations supported by the record.[42]  Plaintiff contends that the ALJ's reliance on the VE was improper for two reasons.

First, Plaintiff contends that she was not allowed to pose a complete hypothetical to the vocational expert.  However, the record shows that Plaintiff's counsel asked the VE a hypothetical question and then advised the ALJ that she had no further questions. (R. 479A).

Second, Plaintiff appears to argue that the ALJ's hypothetical question did not include any restrictions on the use of her arms but that "[r]ecent clarification by her treating doctor . . . indicates that she in fact is limited in the use of her upper extremity."

---

[42] See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999.)

Presumably, Plaintiff is referring to the November 6, 2007 letter from Bernard Chang, M.D., in which Dr. Chang opined that Plaintiff "may have difficulty with muscle activity or lifting" due to fat necrosis in her right breast. (R. 408.) However, evidence of the possibility that Plaintiff "may" have trouble lifting is not a sufficient basis for the ALJ to find that Plaintiff in fact has a limitation in her ability to use her upper extremity. Moreover, Plaintiff testified that she can raise both arms above her head. (R. 461-62.) Accordingly, the ALJ did not err by failing to include an arm restriction in the hypothetical to the VE.

## V. CONCLUSION

Based on the foregoing, the Commissioner's decision is due to be **AFFIRMED.** The Clerk is directed to enter judgment in favor of the Commissioner and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on April 29, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:

All Counsel